## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 25 2017, 9:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Barbara Jo Woolley,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | May 25, 2017<br><br>Court of Appeals Case No.<br>83A05-1612-CR-2765<br><br>Appeal from the Vermillion Circuit Court<br><br>The Honorable Bruce V. Stengel, Judge<br><br>Trial Court Cause No.<br>83C01-1510-F3-6 |

**Baker, Judge.**

Barbara Jo Woolley appeals the sentence imposed by the trial court after Woolley pleaded guilty to four counts of Level 3 Felony Neglect of a Dependent. Woolley argues that the trial court erred in ordering consecutive sentences and by finding an improper aggravating factor. Finding no error, we affirm.

## Facts

In September 2013, Woolley lost her job as a licensed practical nurse at a nursing home. Because of the loss of income, she and her ex-husband, Gordon, moved in with her son, John; John's wife, Danielle; and John and Danielle's four children—J.W. (age eight), C.W. (age five), S.W. (age four), and A.W. (age two).

On October 16, 2015, the Department of Child Services (DCS) received a report alleging that the Woolley home was dirty. When DCS workers and law enforcement entered the residence, they encountered a scene that was described as "the worst neglect case" they had ever seen. Sent. Tr. p. 32-43, 54. Police officers documenting the scene required respirators, disposable foot covers, and gloves for their safety, especially in the upstairs of the home.

The home had a strong odor of urine and feces. S.W. and A.W. were found upstairs in cribs in the master bedroom. The room was cluttered, dark, and dirty. Feces were smeared on the wall behind S.W.'s crib. A.W. appeared dirty. Four-year-old S.W. had wrist bones as small as an infant's and his skin had a yellow tint. Five-year-old C.W. was in the adjacent room, which

contained only a toddler mattress on the floor. She appeared to be very malnourished. Eight-year-old J.W. was found in another room that was locked from the outside. He slept in a wooden bed frame with no mattress, box spring, or pillows. Everything in the room—including every wall, the ceiling, the "bed," the blankets, and the floor—was smeared with feces. The feces on the floor had been there so long that they were smoothed over from being walked on over time. Even the items that J.W. used to eat—his bowl, plate, and sippy cup—were covered in feces. The room had no toys, and the windows were boarded up with plywood.

[5] All four children lacked proper hygiene and were suffering from varying degrees of malnutrition and dehydration. None of the children were potty-trained, none of them could communicate, and none of them even recognized one another. Their physical condition was appalling: J.W. had fecal matter on his legs, under his fingernails, and under his toenails; S.W. had fleas and fecal matter on his body; C.W. had head lice and fleas on her; and J.W. and A.W. had bug bites on their bodies. All the children were pale, had yellow-tinted skin, and would not eat normal food for their ages. Only J.W. could eat solid food; the other children ate only baby food because they did not know how to chew or swallow solids. S.W. was so emaciated that his ribs and hip bones were visible. At the age of four years, he weighed only 22.3 pounds.

[6] None of the children had seen a doctor since they were born except for J.W., who had been to a doctor once when he was three years old. None of the

children had been outside in over a year. Some of the neighbors did not even know that children lived at that residence.

[7] The children's guardian ad litem, an attorney who had been serving as a guardian ad litem for twenty-two years, later described C.W. and S.W. as looking "like Holocaust survivors" and said that the children "were all like no other children that [she] had ever seen." Sent. Tr. p. 17-19. The guardian ad litem summarized their condition as follows:

> All the children suffer from health issues along with indescribable mental and functional impairments . . . . These children never saw the sunshine, the grass, felt the snow, experienced the warmth of loving arms. Instead they were kept in rooms and cribs like caged animals. Diapers, sewage and filth was throughout the house. The children didn't even have the consolation of each other. None expressed any recognition of their siblings. They were deprived of food, health care, love and stimulation. They don't even cry when upset, likely because it has never elicited a response so why bother.

Appellant's App. Vol. II p. 203.

[8] While Woolley's grandchildren were confined upstairs, she regularly left the home to attend classes at Ivy Tech Community College, where she was enrolled in the education program. As part of her coursework, she learned about child and adolescent development and the duty to report child abuse and neglect. Woolley went upstairs daily to see the children and babysat the children more than once. She admitted that the children had been downstairs only two or three times in the two years she had lived in the residence.

On October 30, 2015, the State charged Woolley with four counts of Level 3 felony neglect of a dependent. She pleaded guilty as charged on July 20, 2016. On August 11, 2016, the trial court sentenced Woolley to consecutive terms of sixteen years for the neglect of J.W. and nine years each for the neglect of the other three children—an aggregate term of forty-three years imprisonment. She now appeals.

# Discussion and Decision

## I. Consecutive Sentences

Woolley first argues that the trial court erred by imposing consecutive sentences. Trial courts may only impose consecutive sentences within the bounds of the statutory sentencing scheme. Ind. Code § 35-50-1-2; *Wilson v. State*, 5 N.E.3d 759, 762 (Ind. 2014). Because neglect of a dependent is not listed as a "crime of violence," Woolley's offenses are subject to a statutory cap if they arise from a single episode of criminal conduct. I.C. § 35-50-1-2. Whether multiple offenses constitute a single episode of criminal conduct is a factually sensitive inquiry to be made by the trial court. *Schlichter v. State*, 779 N.E.2d 1155, 1157 (Ind. 2002). In conducting this analysis, the focus is on the timing of the offenses and the simultaneous and contemporaneous nature of the crimes. *Reed v. State*, 856 N.E.2d 1189, 1200-01 (Ind. 2006).

Woolley's offenses do not constitute a single episode of criminal conduct. First, her crimes involve four separate children. *See, e.g.*, *Pittman v. State*, 885 N.E.2d 1246, 1259 (Ind. 2008) (holding that "[c]onsecutive sentences reflect the

significance of multiple victims"). Furthermore, the children each suffered daily neglect over a period of two years. In other words, an individual crime was committed against each child victim every day for two years. It is readily apparent that these crimes do not constitute a single episode of criminal conduct.

[12] The trial court articulately explained its reasons for imposing consecutive sentences:

> [Woolley] was in the household for a little over two years, about 25 months. This conduct was not closely related in time. It was not closely related in circumstances. This was an individual crime committed each day and repeated each day such that the episode of criminal conduct just not—does not apply. This is not a single episode. The probable cause and plea—or probable cause and charging information encompass evidence of multiple acts of neglect, depravity, cruelty and confinement that occurred over multiple years. This did not occur in one single incident over two hours, four hours, six hours, but, in fact, occurred for the vast majority of the childrens' lifetime and for the [entire] lifetime of the youngest child, [A.W.]. So the Court does not feel that . . . our legislature[] intended this [to] apply and there are several cases . . . that indicate this is not considered to be an episode of criminal conduct.

Sent. Tr. p. 79-80. We agree, and find no error with respect to the imposition of consecutive sentences.

## II. Aggravating Factor

[13] Woolley also argues that the trial court found an improper aggravating factor. One of the ways in which a trial court can err in the sentencing process is by

finding aggravators or mitigators that are unsupported by the record or improper as a matter of law. *E.g.*, *Laster v. State*, 956 N.E.2d 187, 193 (Ind. Ct. App. 2011).

[14] Woolley was a licensed practical nurse during the years she lived with the children. The trial court found this to be an aggravating factor, explaining its reasoning as follows:

> All nurses, registered nurses, your licensed practical nurses, at the time they are pinned, when they get their authority to practice take a pledge and that pledge is known as the Florence Nightingale Pledge. I had told the attorneys that I was going to take judicial notice that she was a practical nurse and that pledge is as follows: "I solemnly pledge myself before God and in the presence of this assembly to pass my life in purity and to practice my profession faithfully. I will abstain from whatever is deleterious and mischievous and will not take or knowingly administer any harmful drug. I will do all in my power to maintain and elevate the standard of my profession and will hold in confidence all personal matters committed to my keeping and all my family affairs coming into my knowledge in the practice of my calling. With loyalty I will endeavor to aid the physician in his work and to devote myself to the welfare of those committed to my care." I want to emphasize and repeat the last phrase of the Florence Nightingale Pledge which nurses in Indiana, and I think, in fact, all nurses across the country take. The last phrase is "Devote myself to the welfare of those committed to my care." That does not say to the patients committed to my care but it just says to the welfare of those committed to my care. I think that is an aggravating factor that she's a nurse, that she's taken a pledge to devote herself to those committed to—to devote herself to the welfare of those committed to her care. Also as a nurse she has a legal duty to report evidence of suspected abuse to law enforcement officers. Also as a nurse she has received

specialized training to recognize the situations, to know how devastating it is on youngsters to not have a proper diet, to not get exercise, to not be in the sunlight, to not have cleanliness. She knows all those and she's received special training, although it doesn't take any special training. I once again have to look at these pictures, pictures that have been introduced 1 through 11 to see those to know that this is just a horrible situation, particularly the pictures from 4 through 11 that depict the children.

Sent. Tr. p. 82-83. Woolley argues that this aggravator was inappropriate because the nurse's pledge was evidence outside the record and because her nursing background was irrelevant, inasmuch as "no special training was necessary to detect the inappropriate conditions of the children." Appellant's Br. p. 13.

[15] Initially, we note that Woolley did not object to this aggravating factor, either at the beginning of the sentencing hearing when the trial court indicated its intention to take judicial notice of her nursing background and the pledge or at the end in the passage set forth above. Consequently, she has waived this argument. *Angleton v. State*, 714 N.E.2d 156, 158 (Ind. 1999).

[16] Waiver notwithstanding, we note that Woolley's nursing background is supported by the record. Appellant's App. Vol. II p. 173. Furthermore, we cannot say that the trial court erred by finding that her nursing background is particularly aggravating given the nature of these offenses. Woolley is correct that even a lay person would have recognized that the conditions these four children were forced to live in were unconscionable. Appellant's Br. p. 23-24. Therefore, it is even more egregious when a nurse—a person trained in an

occupation that focuses solely on the health and well-being of other people—takes no action to help her four obviously suffering grandchildren. She had a greater awareness than an average lay person of the physical, mental, and developmental needs of children, but did nothing.

[17] As for the trial court's acknowledgement of the nurse's pledge, it is apparent that the trial court was merely using the pledge to emphasize its point that nurses are in the business of caring for others and, as a nurse, Woolley fell woefully short of what is commonly expected of those in her profession. In other words, the trial court used the pledge to highlight the reason that Woolley's training and experience in the nursing profession was aggravating. We find no error in this regard or in any regard with respect to this aggravating factor.[1]

[18] The judgment of the trial court is affirmed.

Barnes, J., and Crone, J., concur.

---

[1] Even if we did find error in the recitation of the nurse's pledge, it would not render the aggravator itself improper. We are confident that the trial court would still have found Woolley's nursing background to be an aggravator even if it had not been aware of or recited the nurse's pledge.